[Filed November 16, 1885.]
## BERTHA SAVAGE *v.* JOHN SAVAGE.

VENDOR AND VENDEE—FIDUCIARY RELATION.—Ordinarily, when there is no fiduciary relation between the parties, and no confidence is reposed by the vendor as to the particular contract, no duty rests on the vendee to disclose facts he may happen to know advantageous to the vendor.

ID.—PRINCIPAL AND AGENT.—B. S., living in Missouri, appointed J. S., a relative residing in this State, her attorney in fact, to lease lands belonging to her in this State and collect the rents arising therefrom, and relied on him for information as to the condition and value of said lands. Subsequently, B. S. wrote J. S. desiring to sell her said lands, and asking him to make an offer for the land in controversy, and in reply he offered her $6,000 therefor. Prior to the acceptance of such offer, a third person offered J. S. the same sum for a part only of said premises, the latter promising to transmit such offer to the owner, but failing to do so. In a suit to set aside the deed from B. S. to J. S. made upon the acceptance of the latter's proposition, *held,* that there was such a relation of trust and confidence between the vendor and vendee as required the latter to transmit such offer to the former before purchasing himself, and that failing to do so the deed to him should be set aside on repayment of the purchase money.

MARION COUNTY. Plaintiff appeals. Reversed.

*N. B. Knight,* for Appellant.

It is an inflexible rule of law that an agent employed or authorized to sell cannot make himself a purchaser. If he does, the sale is voidable at the option of the principal. It makes no difference how fair the transaction may have been, or in what perfect good faith the agent may have acted, a court of equity will set it aside at the suit of the principal. (*Porter* v. *Woodruff,* 36 N. J. Eq. 179, 180; *Conkey* v. *Bond,* 34 Barb. 276; *Staats* v. *Bergen,* 17 N. J. Eq. 558.) When the fiduciary relation

of principal and agent exists, without any express or special authority in the agent to sell the property of his principal, and the agent purchase it directly from his principal, courts of equity will uphold such a contract only when it affirmatively appears that the agent acted in the utmost good faith; that he concealed or suppressed no fact within his knowledge which might have influenced the judgment of his principal as to the price or value of the property. (1 Story Eq. § 316 *a.*; *Porter* v. *Woodruff, supra; Rubidoex* v. *Parks,* 48 Cal. 215.) The mere fact that a reasonable consideration was paid is not of itself sufficient. Any lack of perfect good faith renders the transaction voidable. (2 Pomeroy Eq. Juris. § 959.)

*Til. Ford,* for Respondent.

Everything so far as the defendant was concerned in the purchase was fair and regular in all respects, and the plaintiff and defendant dealt together as principals and not as principal and agent. Even if the court should find the parties were principal and agent in the transaction, in the absence of fraud the sale would be good. (*Fisher's Appeal,* 34 Pa. St. 29, 31.) The court says: "It never has been supposed that the principal might not sell to his agent, or the client to his attorney, and that their titles thus acquired would not be good in the absence of fraud on their part." (1 Parson Contracts, p. 76.)

THAYER, J. — This appeal is from the Circuit Court for the county of Marion. The appellant commenced a suit in that court against the respondent to have a certain deed executed by the former to the latter, on the 3d day of October, 1882, to certain lands in said county, canceled, and said lands reconveyed to her. She alleged in her complaint that on and prior to the 3d day of October, 1882, she owned said lands in fee; that in April, 1882, she executed to the respondent a power of attorney appointing him her attorney in fact, to take possession and have charge of said lands, to sell the same, execute deeds to purchasers, and do all acts necessary to carry out said power; that after executing said power of attorney, she left the State and

went to Kansas City, Mo., where she remained until April, 1884; that on or about the 1st of October, 1882, she received through the mails an offer from the respondent of $6,000 for the whole of said lands, and desiring to sell the same, and not knowing at the time that any greater sum of money could be obtained therefor, and relying upon the respondent's honesty and good faith, she accepted the said offer, and made him the deed; that the respondent knew that as appellant's agent he had been offered before, and was offered at the said time, and could have sold one of the parcels of the lands, a certain one hundred and twenty-four acre tract, for the sum of $6,000 cash, and could have sold the whole of said lands for $8,000 cash; that they were reasonably worth that sum, and that he fraudulently concealed from the appellant said facts, and by reason of such suppression obtained from her the said deed; that she had after learning of the fraud offered to return him his money and had demanded a reconveyance.

The respondent denied the allegations of the complaint as to his attorneyship, the offer, value of the land, and fraud, and alleged affirmatively that since he purchased the land he had paid out for taxes the sum of $115.

Depositions and proofs having been taken, the case was heard by said Circuit Court and the complaint dismissed, from which decision the appeal was taken to this court. It appears from the testimony and proofs that the appellant was born and raised upon the lands in question; that about 1875 she married and went East with her husband; that her husband having obtained a divorce from her in 1881, she returned and lived with her uncle, John Savage, Jr., on the lands until April 5, 1882, when she went back to Kansas City, Mo., where she resided, as alleged in the complaint; that she and the respondent are second cousins; that she was the owner of the lands; that about the 16th day of September, 1880, she executed to the respondent the following power of attorney:—

"Know all men by these presents that I, Bertha E. Savage, of Junction City, Kansas, have made, constituted, and appointed, and by these presents do make, constitute, and appoint, John

Savage, Sr., of Salem, Marion County, Oregon, my true and lawful attorney in fact for me and in my name, place, and stead, and for my use, to ask, demand, sue for, collect, and receive and receipt for all such sums of money which now or shall be or hereafter are owing or belong to me in the State of Oregon by any person or persons whatsoever; and I hereby further authorize and empower my said attorney in fact to lease or rent any and all lands now owned by me, or which I may have any interest in, in the said State of Oregon, and to collect the rents therefor, and to do everything in and about the premises as fully to all intents and purposes as I could or would do if personally present (with full power of substitution or revocation), hereby ratifying, confirming, and holding valid all that my said attorney shall lawfully do or cause to be done by virtue of these presents. In witness whereof, I have hereunto set my hand and seal this —— day of ——, A. D. 1880.

[SEAL.]                                    " BERTHA E. SAVAGE.

"Done in presence of ARTHUR P. DAVIS."

That the respondent accepted the trust and acted under said power of attorney until the execution of the deed sought to be canceled. It is claimed by the appellant that there was a subsequent power of attorney executed by her to the respondent in April, 1872, empowering him to sell and convey the property as alleged in the complaint, but that is stoutly denied by the latter, and, in the opinion of all the members of the court is not sustained by the evidence.

It further appears from the proofs that the following correspondence, at the respective times therein mentioned, took place between the appellant and the respondent in reference to the sale and purchase of said lands.—

"KANSAS CITY, Aug. 31, 1882.

"*Dear Cousin John:* — In a letter received from Aunt Hattie a short time ago she said you were going to write and advise my selling my property there. At the time I received her letter I thought I would NEVER, NEVER sell, but have changed my mind. There are splendid chances here every day to invest in city residence property which would bring me each year as much as I

get off from the farm in two.    And more than this, property is advancing at least ten per cent each year, and in some localities fifty.    I shall always hope to *sometime* get the little farm back again.    Please give your earliest attention — write me what you will give me for it in cash, and to facilitate matters I will answer your letter by telegram if I accept your proposition; and any way that you can hurry the matter along do so.

"Hope this will find you all well and in the midst of a bountiful harvest with favorable weather to assist in securing it.

"If I thought ma could pay me cash for the place, and as much as anyone else would be willing to pay for it, she would be the one I would write to of my desire to sell; for I remember she once said if I sold she would like to buy it from me; and it is only natural that she should want it.    Let me hear from you as soon as possible.    I am real well and enjoy myself sometimes.    Have been at work this summer you know.    When you write, address me at Kansas City, Missouri, as I get my letters at the postoffice.    With kind regards, I am

"Yours, etc.,          BERTHA SAVAGE."

The following is the respondent's answer to the above:—

"SALEM, Sept. 11, 1882.

"*Dear Cousin:* — I received yours of the 31st yesterday, and was glad to hear you was well.    I did not tell Hattie I was going to advise you to sell; I told her if I could not make the land fetch in more profit, you had better sell it.    I only got three hundred and sixty bushels of oats and sold them for thirty-seven and one half cents per bushels and one hundred and thirty bushels of wheat.    I shall sell it as soon as hauled, then I will pay Ford and Stratton and will send you what is left.    I had not thought of buying your land.    I was going next week to Walla Walla with my money, for I can't let it out here any more only in small dribbs.    So if you conclude to take me up at my offer I won't go; I will give you six thousand dollars for your whole interest here; at that it will be a good while before I could get my money back.    If you conclude to take me up at my offer, telegraph immediately. John is talking of buying the two other heirs out on the Miller

place—the two hundred and fifteen acres—for three thousand six hundred dollars. If he had not of bought the one, I would of bought it, for it is cheaper than yourn, bein' more land and laying together. We are all well and hope you the same. John had more wild oats than anything else and if it ain't summer fallowed, it won't pay taxes and keep fences up. If you take me up, I will send you a check on any bank you say. I would of written before but I wanted to see how much grain you would have.

"From your friend. Write often. Yours etc.

"JOHN SAVAGE."

On the same day the letter was mailed, the respondent notified the appellant of it by telegraph as follows :—

"SALEM, OREGON, Sept. 11, 1882.

"*Bertha E. Savage:*—I have written you an offer of six thousand dollars for your full interest here. If you accept, telegraph immediately.            JOHN SAVAGE."

On September 18, 1882, the appellant telegraphed her acceptance of the offer as follows:—

"KANSAS CITY, Mo., 18th Sept., 1882.

"*John Savage,* P. O. 330, Salem:—I accept your offer; hurry papers along as soon as possible.            BERTHA SAVAGE."

On September 22, 1883, the appellant also wrote the respondent, in which she gave directions about sending the money, and in which she requested that he would send her $500, without waiting for the deeds to be sent there, signed, and returned again. She also suggested that it would probably have been better if she had sent him a quit-claim deed—that it would have expedited the affair. The respondent upon receipt of the appellant's telegram accepting his offer had Judge J. J. Shaw, of Salem, prepare a deed and forward it to the appellant at Kansas City, for execution, which she did at the time before mentioned, October 3, 1882, and sent it to the respondent by mail.

The appellant's counsel contends that at some period between the time the respondent received the appellant's letter of August 31, 1882, and the date of his reply thereto, September 11, 1882, a gentleman by the name of Durbin, who owns land adjoining

the said one hundred and twenty-four acre tract, applied to the respondent to purchase said tract, and thereupon offered to pay therefor the same amount, $6,000, that the respondent paid for all of appellant's lands, including said tract; that instead of informing the appellant that Mr. Durbin would pay said sum for said tract, the respondent took advantage of the circumstances and made said purchase, and thereby obtained the other lands, a reversionary seventh interest in a tract of three hundred and fourteen and forty-six one-hundredths acres, subject to the dower right of Mrs. M. J. Savage, a widow lady, and seventy-eight and eighty-one one-hundredths acres of timber land, alleged to be worth $2,000, for nothing.

There is some contradiction as to the time when Mr. Durbin made said offer, and as to the quantity of land that was included in it. He was examined as a witness in the case, and testified to the following, viz. :—

"Age, fifty-four years; occupation, stock-raiser; residence, Wasco County, Oregon." In answer to question three he says: "I know the tract of one hundred and twenty-four acres, and know about where the timber land is, and the dower property. They are situated on Salem Prairie, that is, the dowry and the one hundred and twenty-four acres; the other is back in the timber, east of the other property.

"Question. 4—You may state if you ever had any conversation with the defendant about the purchase of either of those tracts of land.

"Answer—I had a conversation with Mr. Savage, I think sometime along about the 1st of September, 1882, about the tract of land—one hundred and twenty-four acres. I came to town and heard Mr. Savage wanted to see me. I inquired and looked for Mr. Savage, and found him on Commercial Street. I says, Mr. Savage, I understand you want to see me. He says yes, I wanted to know if you want to buy this piece of land or place of Bertha Savage. I says, I don't know whether I do or not; it is owing to what she asks for it. Well, he says, what will you give for it? I asked him how much there was

of it. He says there is one hundred and twenty-five acres of it. I studied a bit and says, I will give you $5,500 for it, and he says I don't think she will take that for it. We talked and had some conversation about that and other matters, and I finally told him that I would give $6,000 for it if he would telegraph and get me an answer in a short time. He said he thought she would take that for it; and agreed to telegraph to her. I saw him a day or two after that, and I asked him if he had telegraphed to her, he said that he hadn't; that he had written to her; that he couldn't explain things to her as he would like to in regard to the fencing and condition the place was in, but he said I need not be uneasy, that I would get the place; that is, that she would accept my offer. I then, sometime after that, asked Mr. Savage if he had heard from Bertha, and he told me that he hadn't. One day I happened to step into the bank; Mr. Savage was in there doing some business with Mr. Albert. I stood there till they got through their business. From the conversation they were having, I suspicioned that all wasn't right, and asked John Savage if he had heard from Bertha. He said he had, and was just sending her the money for the land. I says to him I don't want you to send any money for me, as I have the money to pay for it myself, and he says I may let you have it yet, and I asked him if he didn't calculate to let me have the land — got into quite a little jower over it. During this time I had heard that she had eighty-seven acres out in the timber, and a dower of forty acres in Mrs. Lute Savage's place. I says Mr. Savage, I am a little ahead there. Mr. Savage says to me, I have done so much for Bertha, and I told him that I would give him $250 for his trouble and expense, besides the $6,000. All the answer that Mr. Savage would make me was that I may let you have it yet. I then told him that he was getting this seventy-eight acres out there in the timber and the dower for what I had offered for the one hundred and twenty-five acres, and he says, I know my own business; I may let you have it yet. I says to him, I will give $8,000 for the whole of it, and I will give you two or three days — I don't recollect just how long — to let me

know whether you will let me have the one hundred and twenty-five acres or not. If you don't I will telegraph to Bertha to not accept your checks; that I will give $8,000 for it. At the length of time that I had given him for an answer he came out to my place, two and one half miles east of Salem—it was after dark when he came there—and I asked him if he had been to supper, we had just got through, and he said he hadn't, and they fixed him a bite of supper, and after that we sit and talked for about an hour over matters and things. Mr. Savage spoke about going home; I says you had better stay all night; he says no, but Sol., I would like to see you a bit. We got our hats and went out to the gate between the house and the road, and Mr. Savage says, I will let you have that place — that piece of land, and make you a deed to it as soon as my wife comes home. She was in the East I believe. Well, I says, that is all right, John; but he says there isn't quite so much of it as I thought there was, only one hundred and twenty-four acres. I says that don't make any difference — one acre don't make any difference. I says here is twenty dollars, you take that John; he says there is no use of that, I give you my word you shall have it; I said your word has always been good to me, but we have had a little dispute about this. He says, it will be all right, and I will make you a deed when my wife comes home. Mr. Savage went home, I suppose. There was nothing more said. I heard that Mrs. Savage was home. I went down there to Mr. Savage's, Mr. Savage wasn't at home; I left word that I would like to see him — would like to have him come up. Mr. Savage didn't come and I left word a second time. Mr. Savage came up and said if I would come into town on such a day he would make out the deed. I went in on the day that was appointed, met Mr. Savage — nothing said — we passed one another; it ran along until it was getting along in the afternoon; I looked around and found Mr. Savage, and told him he had better make out that deed and fix up our business. He then told me that his wife would not sign the deed unless he would give her $1,000. We had a few words and that ended our business.

"Q. 5.— You may state whether, at the time you met the defendant in the bank here, when he was preparing to send the money to the plaintiff for her lands, you offered and would have paid to him in cash $8,000 for the three several tracts of land described in the complaint, and which you have mentioned?

"A.— I would have given $8,000 for it; I believe I offered Mr. Savage that, less the $250 that I had offered him as bonus on the $6,000.

"Q. 6 — You had offered the defendant, then, $6,000 for the one hundred and twenty-four acre tract, and $250 besides, to pay him for his trouble and expense that he has been to; is that the fact or not?

"A.— Yes, that's the fact.

"Q. 7 — During any of the time that you were negotiating with the defendant for the purchase of the one hundred and twenty-four acre tract, did he state to you whether he had the power from the plaintiff to sell the same?

"A.— He did; he said at the time we first talked of the trade he could make me a deed himself, but he would prefer that she would do it. The conversation I had with Mr. Savage in the bank here was in Bush's Bank, Mr. Albert was behind the counter, and I forget who the other man was."

"Cross-examination. Q. 9—State, Mr. Durbin, just what passed between you and Mr. Savage in Mr. Bush's bank in Mr. Albert's presence at the time you have referred to.

"A.— Well, I asked Mr. Savage if he had heard from Bertha; he said that he had, that he was just sending her the money for the land; I says, Mr. Savage, I don't want you to send any money for me, I have got the money myself; he says, well, I may let you have it yet; and the conversation went on; I don't recollect what all was said, but I told him that if he didn't give me an answer in two or three days that I would telegraph to Bertha not to accept his money for the land, that I would give $8,000 for it, and that I would give him two or three days, I think, to give me an answer.

"Q. 12—Did you not go to John Savage, Jr., a short time after you found you couldn't get the land and try to get him to

go in with you and help bust up the plaintiff's deed to the defendant for the land in dispute?

"A.—I did not; but I went to John Savage, Jr., and told him what I had offered Mr. John Savage here, the defendant, and what I understood he was getting for what I had offered for the one hundred and twenty-four acres, and as it was a brother's child, that I thought it was his duty to look into it, and told him that anything I could assist him in I would do so, as I always thought a great deal of her father Lute. Mr. Savage says to me, John Savage has a mortgage on my farm of $2,000 and I am afraid to have anything to do with it. I told him other men had money as well as John Savage."

The respondent was examined as a witness, and testified that the first conversation between him and Mr. Durbin in regard to the sale of the land took place on the 17th or 18th day of September, 1882, the day before appellant accepted his offer, and that Mr. Durbin's proposition was to purchase all of appellant's lands; that it included the three parcels referred to, the same land respondent purchased from appellant. The court has considered this question of fact fully, and concluded that the weight of the testimony upon the question is in favor of the appellant. Mr. Durbin's testimony seems to be corroborated by the circumstances, and also by the testimony of other witnesses, and while it may not be accurate in all its particulars, or invulnerable to criticism, still I think he made the offer to buy the one hundred and twenty-four acre tract of land, and to pay the $6,000 therefor, and that the offer was made before there was any acceptance of respondent's offer made to appellant, by the letter of September 11, 1882, and most probably before that offer was forwarded to her.

If this be the correct view of the facts, it becomes important to inquire whether the respondent was under any legal obligation to inform the appellant of Durbin's offer for the said parcel of land before purchasing it himself in the manner he purchased it. Ordinarily, where there is no fiduciary relation between the parties, and no confidence is reposed by the vendor as to the particular contract, no duty rests upon the vendee to disclose facts

he may happen to know advantageous to the vendor. It is said in 2 Sugden on Vendors, 406, that "it may be laid down as a general proposition, that trustees who accepted the trusts, unless they are nominally such, as trustees to preserve contingent remainders, agents, commissioners of bankruptcy, assignees of bankrupts or of insolvents, whilst the distinction remained, or their partners in business, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, counsel, or any person, who, by being employed or concerned in the affairs of another, have acquired a knowledge of the property, are incapable of purchasing such property themselves, except under certain restrictions." The agency of the respondent only empowered him, first, to collect any and all money due the appellant in the State of Oregon; and second, to lease or rent any and all lands then owned by her, or in which she had any interest, in said State, collect the rents therefor, and do everything in and about the premises as fully, to all intents and purposes, as she could or would do if personally present; and the question arises whether he, by virtue of such relation, was under any obligation to disclose the fact of said Durbin's offer, when the appellant proposed to him to become a purchaser of the property.

Mr. Pomeroy, in his work upon Equity Jurisprudence, section 902, says that "all the instances in which the duty exists, and in which concealment is, therefore, fraudulent, may be reduced to three distinct classes. The first class includes all those instances in which, wholly independent of the form, nature, or object of the contract or other transaction, there is a previously existing definite fiduciary relation between the parties; so that the obligation of perfect good faith and of complete disclosure always arises from the existing relations of trust and confidence, and is necessarily impressed upon any transaction which takes place between such persons." And he gives as examples, contracts and other transactions between a principal and agent, a client and attorney, a beneficiary and trustee, a ward and guardian, and the like. "The second class embraces those instances in which there is no existing special fiduciary relation

between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties in entering into the contract, or other transactions, expressly reposed a trust and confidence in the other, or else from the circumstances of the case, the nature of their dealings or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class." "The third class includes cases where the contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties." And he gives the contract of insurance as an example falling within that class.

The respondent was the agent of the appellant for a certain purpose, but it is doubted whether it was such an agency as is contemplated in the proposition laid down in Sugden, or as comes within the first class of cases mentioned by Prof. Pomeroy. That depends upon what the reason or foundation of the rule is, which incapacitates or restricts the right of the party to purchase the property in such cases. If it is solely because the agent is under an existing contract with the principal to aid and assist him to the best of his ability in the disposal of the property, then I would suppose that a mere agency to rent property and collect and pay over the proceeds would not preclude the agent from purchasing it as freely as a stranger might do. The agent, in such a case, does not contract to discharge a duty connected at all with the sale of property. But if the obligation arises out of the trust and confidence which the relation shows was reposed in the purchaser by the vendor, then it is immaterial whether the authority empowered the purchaser to sell or rent the property. The relation proves a trust and confidence in either case. In the case of attorney and client, I apprehend that it would make no difference, if the former purchased property of the latter, whether he was employed in a matter concerning the property, or concerning some other affair of the client; that he would be as much obligated in the one case as the other to disclose every fact that would tend to enhance its value, and that

the reason therefor would be the trust and confidence arising from the relations of the parties. That is certainly the reason why a guardian cannot purchase property from his ward. But whether the relation between the appellant and respondent was of such a character or not, their position towards each other was such that a trust and confidence in the particular case is implied.

The parties are relatives; the appellant was living out of the State; she had made the respondent her agent, as before mentioned, and he was acting in that capacity when the offer of Durbin was made for the property. And I think, under these circumstances, it was his duty to have informed the appellant of the offer. It is true she wrote him to make her an offer, but it is evident, from the tenor of her letter, that she expected to get as much from him as anyone else would give. She says in her letter of August 31, 1882: "If she thought ma could pay her cash for the place, and as much as anyone else would be willing to pay for it, she would sell it to her." She did not intend to let it go to anyone for less than it would bring, and if the respondent had communicated to her the offer Durbin had made, she certainly would not have accepted the respondent's offer. The tenor of the respondent's letter was calculated to induce her to accept his offer. It contained a statement of the yield of the land that season, and the account was far from encouraging; besides, it conveyed the idea that if he made the purchase it would be a very slow investment, says, "I will give you $6,000 for your whole interest here; at that, it would be a good while before I could get my money back." Now, if Durbin had already made him an offer of the same amount of money for the one hundred and twenty-four acre tract alone, as I am inclined to believe, from the testimony, he had, the statement was not candid. He should, in any event, have communicated to the appellant the fact of Durbin's offer, though made after he transmitted his proposition to purchase. He acquired the knowledge of the fact from his connection with her affairs, and honesty and fair dealing, under the circumstances of the case, required him to give the information. The parties were not dealing "at

arms length," nor upon an equality of footing. The respondent was upon the ground, and had the management and control of the premises, and the appellant, as between her and the respondent, was entitled to receive therefor all that any person would pay, and no doubt believed, when she accepted the offer and executed the deed, that she was obtaining as high a price for her lands as anyone else would be willing to give.

I think the said deed should be canceled upon the appellant's doing equity. She must, of course, first restore to the respondent what he has paid her, the $6,000. Her attorney made some kind of written offer before the suit was commenced to pay him back the money, less $1,200, the rental value of the premises, but I do not think the offer was sufficient. She had had the use of the money, and that in my opinion was worth as much or more than the use of the lands; consequently she should not be allowed costs. The respondent claims to have paid taxes upon the property, but the taxes upon the money which she was liable to pay, and probably did pay, is a fair stand-off. The respondent should have interest upon the $6,000, at the rate of eight per cent per annum, and be charged with the rents and profits.

The decree should be that upon the appellant's paying to the respondent the sum of $6,000, and interest at the rate aforesaid, less rents and profits, within ninety days from the date of the entry of the decree in this court, with interest thereon at the rate of eight per cent per annum from the date of such entry, the respondent reconvey to her the entire lands conveyed to him by the said deed. That the deed of reconveyance contain a covenant against any acts of the respondent, done or suffered, except the non-payment of taxes levied during the year 1885, and that the original deed from the appellant to the respondent be thereupon set aside and canceled. The respondent could, after the suit was begun, have made an offer under section 511 of the Civil Code, to allow a decree to be given against him for the relief granted herein, and have recovered costs from the time of the service of the offer, but not having availed himself of the benefit of that provision, he should not be entitled to recover costs.

Neither party, therefore, will be allowed costs or disbursements in.either court, but each shall pay one half of the disbursements incurred herein.

[NOTE.— On a petition for a rehearing on the question of costs the appellant was allowed her disbursements in this court and the Circuit Court. — REP.]